## Dolfinger Estate

*William White, Jr., Duane, Morris & Heckscher,* for accountants.

*James L. Price, Special Assistant Attorney General,* for Commonwealth.

TAXIS, P. J., April 21, 1968.—The reason or purpose of the filing of the present account is the fact that the trust has been in operation for more than 10 years, and the trustees desire confirmation of their administration to date, together with a ruling on their requests for interim corpus commissions. . . .

Henry Dolfinger died on June 10, 1939, leaving a will dated November 22, 1937, wherein the trust was created in which under Item Sixth of his will, decedent devised and bequeathed his residuary estate in trust to pay the income first to his wife, Matilda, and to his daughter, Caroline D. McMahon, and finally to his granddaughter, Mary Matilda McMahon, for their respective lives. If, upon the death of his wife, daughter and granddaughter there should be then no living issue of his granddaughter, [which has occurred] testator directed the trustees to pay the principal as the granddaughter Mary M. McMahon might appoint by will.

Matilda Dolfinger, the wife, died June 7, 1946; Caroline D. McMahon, the daughter, died September 29, 1956, and Mary M. McMahon, the granddaughter, died August 5, 1956. There were no issue living on September 29, 1956, the date of death of the survivor of the three mentioned above, and accordingly, the principal of this trust became subject to the general testamentary power of appointment given Mary M. McMahon in testator's will.

Mary M. McMahon left a will dated July 8, 1952, duly probated in the office of the register of wills on

August 23, 1956, in which she exercised her power of appointment. In exercise of her power of appointment Mary M. McMahon appointed the principal of her grandfather's estate to her trustees [the present accountants] in trust, to invest and reinvest the principal which is to be known as "Dolfinger-McMahon Foundation," on the following terms:

(a) The trustees shall distribute the net income for such exclusively charitable or educational purposes as they may determine in their sole and absolute discretion.

(b) The trustees are authorized to make charitable grants or payments *out of principal* subject to the limitation that not more than five percent of the value of the principal at the beginning of a trust year can be granted or paid out during such year.

(c) Trustees "shall have the broadest possible latitude in determining the manner in which the Dolfinger-McMahon Foundation shall be administered", including power to "establish such rules and regulations as they may deem wise", to designate additional trustees to serve with them or to create a separate advisory board to assist them, the power to incorporate, and the power to employ persons, firms and corporations to assist the trustees in the administration of the foundation.

The present trust is one of four virtually identical trusts, all of which are held by the same two trustees for identical charitable purposes as components of what is known as the "Dolfinger-McMahon Foundation".

The other three trusts are: 1. Trust under Item Sixth of will of Caroline D. McMahon, deceased; 2. trust under Deed of Henry Dolfinger dated November 13, 1935, as modified by Item Fifth of the will of Caroline D. McMahon, deceased; 3. trust under deed

of Maurice Heckscher and Sanford D. Beecher dated August 14, 1957. Accountings in these trusts, the first and third, have been filed in the Orphans' Court of Montgomery County and adjudications are handed down contemporaneous with this adjudication. The court has been advised that the second trust listed above is being audited by the Orphans' Court of Philadelphia County.

The accountants advise the court that these four trusts have been administered by the trustees for investment, administration and distribution purposes as a single fund under the name of the "Dolfinger-McMahon Foundation," except that separate accounts have been kept of each trust.

It would seem that this type of consolidated operation was contemplated by Caroline D. McMahon and by Mary M. McMahon upon examinations of their wills. Thus in the purchase of investments, securities are allocated to the several trusts on the basis of available cash rather than with regard to diversification within a particular trust.

Similarly, the trustees, in distributing income for charitable purposes, handle the four trusts as a single fund, since this is the most practical way for them to proceed in order to support a number of substantial charitable projects at the same time.

Every two years the trustees have prepared a biennial report which has been distributed widely to social, health, educational and other eleemosynary agencies and institutions in the Greater Philadelphia area. At the time of audit, copies of each of these biennial reports have been submitted to the court for its perusal. The court has found these reports of value in resolving the question of the reasonableness of the interim corpus commissions requested by the trustees of this trust and the trust under Item Sixth of the will of Caroline D. McMahon, deceased. . . .

In the present account, the trustees have requested interim corpus commissions for the last ten years of their administration in the amount of $53,710.

The question presented to the court in this accounting and in the Caroline D. McMahon accounting is the propriety and reasonableness of interim corpus compensation requested.

In Item Tenth of the will of Mary M. McMahon the following provision is set forth:

"Because the trust of the residue of my estate is a perpetual trust, I direct that the trustees shall be paid reasonable commissions out of principal from time to time, in addition to commissions on income".

The question presented is new and unusual in the law of charitable trusts.

A number of cases state the rule that a charitable trust is not defeated by a provision in the instrument creating it that the trustee is to receive compensation for his services. A reading of these cases, the Restatement and text writers, disclose that this rule was referring to compensation *out of income*. When payable from income, no problem arises.

Where, however, the settlor or testator expressly directs the payment of *interim corpus* commissions, I know of no statutory law or case law which decrees that such compensation is improper.

In the absence of an *express direction, interim corpus compensation* to the trustee of a charitable trust is not allowable.

The next question is whether, in light of the circumstances and facts that have been presented to the court, the commissions requested are "reasonable" within the meaning of that term as used in the will of Mary M. McMahon.

After consideration of all matters presented to the court in aid of the determination of this question, the court is satisfied that the request for interim com-

missions out of principal is reasonable and is herewith approved, allowed and awarded.

By a letter dated March 26, 1968, James L. Price, Special Assistant Attorney General, has expressed the views of the Commonwealth, as follows:

"Dear Judge Taxis:

"This will confirm our several conversations with respect to the petition which is presently before you concerning the request of the Trustees for interim commissions out of principal.

"I have reviewed the matter with Mr. Woods, Deputy Attorney General, and he concurs in the conclusion that we reached that in the ordinary situation such commissions would not be allowable. However, in view of the expressed language of the Trust in question, which makes provision for the same, there would appear to be no objection to such payment. Further, the existence of such language in the Deed of Trust precludes the possibility that this case could become authority for such payments generally.

"However, the problem that is presented by the amount of the commission to be paid falls into a different category. It is the conclusion of the Department, that we should not, as a matter of policy, attempt to set up any guide line, which apart from the facts of the particular case might serve as the basis for the award of commission in any particular case. It is our feeling that in any event the amount of compensation which shall be paid to a Trustee is within the sole discretion of the Court and that it is not within the province of the Attorney General's office as parens patriae to attempt to fix the amount of such compensation.

"We do feel however that it is proper for our office to indicate whether or not the requested compensation is in such an amount as would be deemed unreason-

able. We have reviewed the factors involved in this situation as the same have been set forth in the supporting memorandum which was filed by the Trustees, and we have concluded that we have no objection to the amount of compensation which has been requested in this situation".

It seems to the court that the reason for the provision for interim principal commissions becomes obvious when one considers the nature of the trusts and the duties imposed upon the trustees. In addition to the usual responsibilities of trusteeship which these accountants are performing with the aid of investment counsel and custodian services expressly authorized by Mary M. McMahon's will, the trustees are also faced with the responsibility of selecting from a great many applicants the charitable beneficiaries who actually receive the financial aid contemplated by the creators of the Dolfinger-McMahon Foundation.

It will be noted that the trustees have been given broad discretionary power in the selection of the charitable beneficiaries and by far the most difficult and time-consuming aspect of the operation of this Foundation is the selection of these beneficiaries. The trustees have diligently recognized that there is implicit direction that a conscientious effort be made to make the funds of this foundation an effective community force in the charitable and educational fields in Greater Philadelphia area.

The manner in which the trustees have discharged this substantial responsibility appears, quite fully, from the four biennial reports which were submitted to the court and heretofore referred to.

The trustees recognized very early in the administration of the several trusts as a Foundation that the income available for distribution, although substantial, was sufficiently limited to require the establishment of reasonable limits in the areas of charitable

projects which should be considered appropriate for financial support.

Accordingly, the trustees decided that grants should be made only, (1) to experimental, demonstrational or so-called "trigger-money" projects, in the Greater Philadelphia area; (2) in limited situations to tide an agency over a temporary emergency; and (3) for less limited purposes, to those charitable agencies specifically mentioned by Caroline and Mary McMahon in their wills.

A random selection and brief description of projects from the reports illustrates the way in which the trustees have sought to aid projects of particular value to the community:

In 1957 and for several years thereafter, the trustees, concerned over acts of violence and intolerance committed in connection with the acquisition and occupancy by negroes of homes in Levittown, Pa., and Levittown, Burlington County, N. J., made substantial grants to the American Friends Service Committee to support their efforts to promote integration without violence. Through the efforts of the American Friends Service Committee and other community individuals and agencies, successful resolution of friction was achieved and subsequent violence avoided.

In 1958, with financial support over a three-year period, the Bryn Mawr College School of Social Work was able to establish a Center for Research in the Social Services, which center has since become self-supporting and exceedingly successful.

A single modest grant in 1957 to the Greater Philadelphia Council of Churches brought about the establishment of a Sunday School for Retarded Children. It is believed this experimental school was one of the first, and perhaps the first, of its kind in this country, and its success has made it the prototype for similar schools in the city and elsewhere.

The Lankenau Hospital, in 1961, and for several years thereafter, received grants to reestablish its Health Education Program, as a result of which this hospital program has become a most successful and widely accepted facility for the teaching of good health habits and procedures throughout the Greater Philadelphia community.

In 1963 and later years, the trustees supported the Academy of Religion and Mental Health in its establishment of seminars and discussion groups throughout the Greater Philadelphia area, to develop closer collaboration among clergymen, social workers, physicians, and psychologists, for the care and treatment of those with emotional problems.

By the Book Awards Project, operated by the School District of Philadelphia, the trustees have sought to encourage the learning of good reading habits and the ownership of good books by underprivileged school children through the award of sizeable collections of good books to those sixth and seventh grade students in West Philadelphia Public Schools that are selected as having shown the greatest improvement in the quality and amount of their independent reading each year.

Starting in 1965, the trustees have supported and continue to support a project entitled: "A Physiotherapeutic Educational Approach to Children with Severe Learning Problems of the Montgomery County Mental Health Clinics, Inc."

The foregoing random samples of grants made by the trustees show the variety and high degree of selectiveness. They also serve as indicators of the amount of time, skill and effort that must be expended in the screening and selection process.

After due deliberation and full consideration, the court concludes that the trustees are performing services of unique value which fully warrant compensa-

tion as requested. Moreover, the court directs that accountings be filed in this foundation at least every 10 years in order to supervise these various matters . . . .

And now, April 19, 1968, this adjudication is confirmed nisi.